**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

**No. 21-2286**

―――――――――――

G.T., by his parents MICHELLE and JAMIE T., on behalf of himself and all similarly situated individuals; K.M., by his parents DANIELLE M. and STEVEN M., on behalf of themselves and all similarly situated individuals; THE ARC OF WEST VIRGINIA,

Plaintiffs – Appellees,

v.

THE BOARD OF EDUCATION OF THE COUNTY OF KANAWHA,

Defendant – Appellant,

and

KANAWHA COUNTY SCHOOLS; RON DUERRING, Superintendent, Kanawha County Schools, in his official capacity,

Defendants.

----------------------

FORMER U.S. DEPARTMENT OF EDUCATION OFFICIALS; CIVIL LAW PROFESSORS; TWELVE LEADING NATIONAL DISABILITY RIGHTS ORGANIZATIONS; MEMBERS AND ALLIES OF THE NATIONAL EDUCATION CIVIL RIGHTS ALLIANCE,

Amici Supporting Appellees.

―――――――――――

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  Irene C. Berger, District Judge.  (2:20-cv-00057)

―――――――――――

Argued:  October 28, 2022                    Decided:  September 5, 2024

_____

Before WYNN and RUSHING, Circuit Judges, and MOTZ, Senior Circuit Judge.

_____

Reversed and remanded by published opinion.  Judge Rushing wrote the majority opinion, in which Judge Motz joined.  Judge Wynn wrote an opinion concurring in part and dissenting in part.

_____

**ARGUED:**  Richard Scott Boothby, BOWLES RICE, LLP, Parkersburg, West Virginia, for Appellant.  Samir I. Deger-Sen, LATHAM & WATKINS LLP, New York, New York, for Appellees.  **ON BRIEF:**  J. Mark Adkins, Gabriele Wohl, William M. Lorensen, BOWLES RICE LLP, Charleston, West Virginia, for Appellant.  Lydia C. Milnes, Blaire L. Malkin, MOUNTAIN STATE JUSTICE, INC., Charleston, West Virginia; Lori Waller, DISABILITY RIGHTS WEST VIRGINIA, Charleston, West Virginia; Ira A. Burnim Lewis Bossing, JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW, Washington, D.C.; Shira Wakschlag, THE ARC OF THE UNITED STATES, Washington, D.C.; Peter Trombly, New York, New York, Robin Hulshizer, Kirstin Scheffler Do, Karen Klass, Jaime Zucker, Renatta Gorski, LATHAM & WATKINS LLP, Chicago, Illinois, for Appellees.  Richard D. Salgado, Kelsey L. Smith, Abron Hester, JONES DAY, Dallas, Texas, for Amici Twelve Leading National Disability Rights Organizations.  Andrew Sacks, Seattle, Washington, Kenneth L. Schmetterer, Chicago, Illinois, Madeline Cordray, Phoenix, Arizona, Emily Gilman, Washington, D.C., Jocelyn Brocato, DLA PIPER LLP (US), Baltimore, Maryland, for Amici Members and Allies of the National Civil Rights Alliance.  Aaron W. Panner, Gavan W. Duffy Gideon, Mark P. Hirschboeck, Alex P. Treiger, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C., for Amici Former U.S. Department of Education Officials. Noah Brumfield, Washington, D.C., Justin Ormand, Mark L. Daniels, ALLEN & OVERY LLP, New York, New York, for Amici Civil Law Professors.

_____

2

RUSHING, Circuit Judge:

The Individuals with Disabilities Education Act (IDEA), 84 Stat. 175, as amended, 20 U.S.C. § 1400 *et seq.*, guarantees a free appropriate public education for certain students with disabilities. Two students receiving special education services filed this class action lawsuit against the Kanawha County Board of Education, alleging that the Board denied them, and other similarly situated students, that guarantee. The lawsuit also alleged violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The district court certified a class of "[a]ll Kanawha County Schools students with disabilities who need behavior supports and have experienced disciplinary removals from any classroom." *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, No. 2:20-cv-00057, 2021 WL 3744607, at *9 (S.D. W. Va. Aug. 24, 2021). The Board appealed, arguing that certification of the plaintiff class was inconsistent with Federal Rules of Civil Procedure 23(a) and (b)(2). We agree that the certified class fails to satisfy Rule 23(a)(2)'s commonality prerequisite and therefore reverse the district court's certification order.

## I.

## A.

The IDEA offers federal funds to assist States in educating children with certain physical or intellectual disabilities. 20 U.S.C. § 1412; *see also id.* § 1401(3)(A)(i) (listing covered disabilities). In exchange for the funds, a State pledges to comply with "extensive goals and procedures." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295 (2006) (internal quotation marks omitted). Among these statutory conditions, the State

commits to provide a free appropriate public education—or FAPE, for short—to all eligible children. 20 U.S.C. § 1412(a)(1); *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748 (2017).

A FAPE consists of "special education" and "related services" tailored to the needs of a particular child. 20 U.S.C. § 1401(9); *see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982). "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29). "Related services" include "such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." *Id.* § 1401(26)(A). This education is to be furnished in the "[l]east restrictive environment," which means that, "[t]o the maximum extent appropriate," a child with a disability should be "educated with children who are not disabled." *Id.* § 1412(a)(5)(A); *see also A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 319 (4th Cir. 2004).

The IDEA requires a State to "identif[y], locate[], and evaluate[]" all children with disabilities residing in the State. 20 U.S.C. § 1412(a)(3)(A). The state or local educational agency evaluates each child across a variety of domains—functional, developmental, and academic—to determine the child's eligibility for special education and the child's educational needs. *Id.* § 1414(a)(1)(C)(i), (b)(2).

Once a child is identified and evaluated, the "primary vehicle for providing each child with the promised FAPE" is an "individualized education program," or IEP. *Fry*, 137 S. Ct. at 749 (internal quotation marks omitted); 20 U.S.C. §§ 1412(a)(4), 1414(d). "[T]he IEP spells out a personalized plan to meet all of the child's 'educational needs.'" *Fry*, 137 S. Ct. at 749 (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(II)(bb)). Among other things,

4

the IEP documents the "child's present levels of academic achievement and functional performance"; specifies "measurable annual goals, including academic and functional goals"; describes "how the child's progress . . . will be measured"; and explains "the special education and related services" the child will receive. 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(IV); *see also Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017).

An "IEP team," consisting of the child's parents, school officials, and teachers, creates the plan and meets "at least once annually" to review it. *Bouabid v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 62 F.4th 851, 856 (4th Cir. 2023); 20 U.S.C. § 1414(d)(1)(B), (d)(4)(A)(i). In developing the IEP, the team considers "the strengths of the child"; any "concerns of the parents"; the results of the child's evaluations; the "academic, developmental, and functional needs of the child"; and any relevant "special factors." 20 U.S.C. § 1414(d)(3)(A)–(B). When reviewing the IEP, the team assesses whether the child's annual goals are being achieved and may revise the IEP to address "any lack of expected progress toward the annual goals," the results of any reevaluation, any additional information provided by the parents, "the child's anticipated needs," or "other matters." *Id.* § 1414(d)(4)(A).

Especially relevant to this appeal is the behavioral "special factor." *Id.* § 1414(d)(3)(B). If a child's behavior "impedes the child's learning or that of others," the IEP team must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." *Id.* § 1414(d)(3)(B)(i). Neither the IDEA nor its implementing regulations define "positive behavioral interventions and supports." *See*

5

H. Rutherford Turnbull, III, et al., *IDEA, Positive Behavioral Supports, and School Safety*, 30 J. L. & Educ. 445, 449–450 (2001).

When addressing behavior problems, a school may remove a child with a disability from the classroom just as it would a child without a disability, so long as a "change in placement"—like removal to an "alternative educational setting" or suspension—does not exceed ten school days.  20 U.S.C. § 1415(k)(1)(A)–(B).  For a change in placement exceeding ten school days, the IEP team must conduct a "[m]anifestation determination" to decide whether a specific instance of misbehavior was "a manifestation of the child's disability."  *Id.* § 1415(k)(1)(E); *see also AW ex rel. Wilson v. Fairfax Cnty. Sch. Bd.*, 372 F.3d 674, 677 (4th Cir. 2004).  If the misbehavior was a manifestation of the child's disability, the IEP team conducts a "functional behavioral assessment" and "implement[s] a behavioral intervention plan" for the child (or reviews the existing behavioral intervention plan, if one was already in place).  20 U.S.C. § 1415(k)(1)(F)(i)–(ii).  A "functional behavioral assessment" is a process to identify "the purpose and the effect of the problem behavior(s)."  W. Va. Bd. of Educ., Policy 2419: Regulations for the Education of Students with Exceptionalities (2023), at 16.[1]  A "behavior intervention plan" is an individualized written plan that "describes the positive behavioral interventions, strategies, and supports" required to implement the student's IEP goals and objectives.  *Id.* at 12.  It

---

[1] Policy 2419 is available at https://wvde.us/special-education/policies-and-compliance/policy-2419/ [https://perma.cc/JZ95-Y946].  The West Virginia Procedures Manual for the Education of Students with Exceptionalities is attached and incorporated by reference into the Board's regulations.  *See* W. Va. Code R. § 126-16-3.

6

may include, for example, "environmental modifications," "instruction in the use of new skills as a replacement for problem behaviors," and "consequences to promote positive change," among other strategies. *Id.*

The IDEA also establishes procedures for resolving disputes between parents and schools about a child's special education. *See Fry*, 137 S. Ct. at 749. Dissatisfied parents may file a complaint with the appropriate local or state educational agency and attempt to resolve their differences through informal meetings, a mediation process, and ultimately a formal due process hearing. 20 U.S.C. § 1415(b)(6), (e), (f)(1)(A), (f)(1)(B)(i). A hearing officer may grant substantive relief only "based on a determination of whether the child received a [FAPE]."[2] *Id.* § 1415(f)(3)(E)(i). Finally, parents may seek judicial review by filing a civil action in state or federal court. *Id.* § 1415(i)(2)(A). Like the hearing officer, a court "may provide a substantive remedy only when it determines that a school has denied a FAPE." *Fry*, 137 S. Ct. at 754 n.7; *see also id.* at 752 ("[T]he only relief the IDEA makes available" is "relief for the denial of a FAPE." (internal quotation marks omitted)); *R.F. ex rel. E.F. v. Cecil Cnty. Pub. Schs.*, 919 F.3d 237, 247 (4th Cir. 2019) ("[N]ot all procedural violations of the IDEA result in the denial of a FAPE."). The standard for making that determination is whether the educational program offered to the child is "reasonably

---

[2] "Without finding the denial of a FAPE, a hearing officer may do nothing more than order a school district to comply with the . . . procedural requirements" of Section 1415, which include, for example, "allowing parents to 'examine all records' relating to their child." *Fry*, 137 S. Ct. at 754 n.6 (quoting 20 U.S.C. § 1415(b)(1)); *see* 20 U.S.C. § 1415(f)(3)(E)(iii).

calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001.

B.

Although the IDEA is the focus of this appeal, we must briefly mention the two other federal statutes underlying this lawsuit. Those laws "cover both adults and children with disabilities, in both public schools and other settings." *Fry*, 137 S. Ct. at 749.

Title II of the Americans with Disabilities Act (ADA) states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities," which are also defined. *Id.* § 12102(1)(A); *see also id.* § 12102(2) (defining "major life activities"). A regulation implementing Title II requires public entities to administer programs "in the most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d), which is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible," *id.* pt. 35, App. B; *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999) ("Unjustified isolation . . . is properly regarded as discrimination based on disability.").

Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

8

discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Like the ADA, the Rehabilitation Act's definition of "disability" is "broader than that used in the IDEA." *Johnson v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 20 F.4th 835, 841 n.6 (4th Cir. 2021); *see also* 29 U.S.C. § 705(9), (20). Section 504 "requires that public schools provide reasonable accommodations to students with disabilities." *Johnson*, 20 F.4th at 841 n.6. To satisfy the Act's requirements, a student with a disability may receive a so-called "504 Plan" or an IEP that complies with the IDEA. *See* 34 C.F.R. § 104.33(b)(1)–(2).

## C.

Plaintiffs G.T. and K.M. are students who receive special education and related services at Kanawha County public schools. G.T. has been diagnosed with autism and attention deficit hyperactivity disorder (ADHD). He has exhibited challenging behaviors and has been suspended from school as a consequence. G.T. has an IEP, a functional behavioral assessment, and a behavior intervention plan. K.M. has been diagnosed with Down syndrome, ADHD, and oppositional defiant disorder. He also has exhibited challenging behaviors and has been suspended from school as a result. K.M. has an IEP, a functional behavioral assessment, and a behavior intervention plan.

G.T. and K.M.[3] sued the Board on behalf of themselves and a class of similarly situated students, alleging that the Board "fails to provide effective behavior supports" for

---

[3] G.T. and K.M. were joined by the Arc of West Virginia, an organization that advocates for people with intellectual and developmental disabilities and their families.

students with disabilities, "leading to unjustified disciplinary removals from the classroom" for misbehavior.[4]  J.A. 26.  According to Plaintiffs, the Board "has no functioning system for identifying children with disabilities who need behavior supports" and "fail[s] to provide its students with effective behavior supports and interventions, including [functional behavior assessments], [behavior intervention plans], and other positive behavior supports."  J.A. 29, 42.  The complaint further alleged that, by "fail[ing] to adequately analyze the root causes of students' concerning behaviors," the Board "fails to create effective IEPs or [behavior intervention plans] for them," and that even when students' plans do "contain appropriate behavior interventions," the Board "fails to ensure that such plans are effectively implemented."  J.A. 60.  Plaintiffs asserted that the Board's conduct violated their rights under the IDEA, Section 504 of the Rehabilitation Act, Title II of the ADA, and the West Virginia Human Rights Act, W. Va. Code § 5-11-1 *et seq.* They sought injunctive and declaratory relief, including an order that the Board provide Plaintiffs "with the effective behavior supports they need to receive a FAPE and avoid discrimination, and enable them to be educated in general education classrooms with their peers."  J.A. 29.  As further relief, the complaint sought an injunction ordering the Board "to revise its policies, practices, and procedures as necessary," appointment of an independent monitor, and attorney's fees.  J.A. 67–68.

---

[4] Before suing, G.T. and K.M. individually pursued administrative relief in due process hearings, with mixed results.  On appeal, the Board does not argue for dismissal based on failure to exhaust administrative remedies.

10

Plaintiffs moved to certify a class of "[a]ll Kanawha County Schools students with disabilities who need behavior supports and have experienced disciplinary removals from any classroom," and the district court granted their motion. *G.T.*, 2021 WL 3744607, at *9. As relevant here, to satisfy the commonality requirement of Rule 23(a)(2), Plaintiffs asserted six questions were common to the class:

> whether the [Board] properly (1) identifies students with disabilities who need behavior supports; (2) develops and implements those supports, including in [behavior intervention plans]; (3) monitors whether the students then make academic progress; (4) avoids unjustified disciplinary removals from the classroom; (5) trains its staff to undertake these essential functions of educating children with disabilities; and (6) ensures students receive needed behavior supports to avoid discrimination.

*Id.* at *12 (internal quotation marks omitted). The district court recognized that Plaintiffs could not "point to a single [problematic] policy" driving the alleged statutory violations. *Id.* at *14. But the court reasoned that Plaintiffs had presented "expert evidence" of "disproportionate rates of suspension for students with disabilities" and "detailed qualitative analysis of [a sample of] student records" and from these had identified "a cohesive pattern that reveals the absence of . . . an effective system for developing and implementing behavioral supports for students with disabilities whose behavior interferes with their learning or that of others." *Id.* at *13–14. While the court acknowledged that "[e]ach student will need a different set of supports," it stated that "this case is not about the behavioral supports that should be provided" but about the "procedures that [the school district] uses, or does not use, to develop and implement those supports." *Id.* at *14.

11

The Board timely petitioned this Court for permission to appeal the class certification order, which we granted. *See* Fed. R. Civ. P. 23(f). We have jurisdiction pursuant to 28 U.S.C. § 1292(e).

## II.

We review a district court's decision to certify a class for abuse of discretion. *Brown v. Nucor Corp.*, 785 F.3d 895, 901 (4th Cir. 2015). A district court abuses its discretion "when it materially misapplies the requirements of Rule 23," *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014), makes an error of law, or clearly errs in its factual findings, *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006).

## III.

The class action device is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982)). The premise is that "litigation by representative parties adjudicates the rights of all class members." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998). Accordingly, a party seeking class certification must first demonstrate the four prerequisites of Rule 23(a): numerosity of parties, common questions of law or fact, typicality of claims or defenses of the representative parties, and adequacy of representation.[5] Fed. R. Civ. P. 23(a). Merely pleading compliance with these

---

[5] In addition, the class action must fit within "one of the three categories enumerated in Rule 23(b)." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). The district court certified Plaintiffs' proposed class under Rule 23(b)(2). We need not

12

requirements is not enough; rather, "the party must present evidence that the putative class complies with Rule 23." *EQT Prod.*, 764 F.3d at 357.

The crux of this appeal is whether the certified class meets Rule 23(a)'s commonality requirement.[6]  Rule 23(a)(2) requires a plaintiff to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  Although the rule is phrased in terms of common questions, "[w]hat matters to class certification is . . . the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation marks and ellipsis omitted).  A single common question will suffice, but it "must be of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*; *see also id.* at 359; *EQT Prod.*, 764 F.3d at 360.

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 349–350 (quoting *Falcon*, 457 U.S. at 157).  It is not enough that the class members "have all suffered a violation of the same

---

"determine whether the action meets the criteria of section (b), if plaintiffs' action fail[s] to qualify for class action treatment under section (a) of Rule 23," because a party must satisfy section (a)'s qualifications "before compliance with section (b) of Rule 23 is considered." *Broussard*, 155 F.3d at 337 n.3 (internal quotation marks, ellipses, and brackets omitted).

[6] Because we conclude that the certified class fails this prerequisite, we do not address the Board's alternative arguments. *See Poindexter v. Teubert*, 462 F.2d 1096, 1097 (4th Cir. 1972) (per curiam) ("In order for an action to proceed as a class action, the four prerequisites set out in Rule 23(a) must be satisfied.").

provision of law." *Id.* at 350. Rather, all class members' "claims must depend upon a common contention" that is capable of classwide resolution. *Id.* "Dissimilarities within the proposed class" have "the potential to impede the generation of common answers." *Id.* (internal quotation marks omitted); *see also Brown*, 785 F.3d at 909 ("[A] court must examine whether differences between class members impede the discovery of common answers.").

In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court held that a class of 1.5 million former and current female employees "who have been or may be subjected to Wal-Mart's challenged pay and management track promotions policies and practices" failed to meet the commonality requirement. 564 U.S. at 346 (internal quotation marks omitted). The Court explained that "the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury" gave "no cause to believe that all their claims can productively be litigated at once." *Id.* at 350. The plaintiffs wished to sue "about literally millions of employment decisions at once" but the Court found no "glue holding the alleged *reasons* for all those decisions together." *Id.* at 352. Because the plaintiffs did not provide "convincing proof of a companywide discriminatory pay and promotion policy" driving those decisions, they failed to establish "the existence of any common question." *Id.* at 359.

## A.

Our Court has not previously addressed certification of an IDEA class, but three of our sister circuits have. Those courts have unanimously held that, to satisfy Rule 23(a)'s commonality requirement after *Wal-Mart*, plaintiffs must "identify[] a uniformly applied,

14

official policy of the school district, or an unofficial yet well-defined practice, that drives the alleged violation." *Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13, 29 (1st Cir. 2019); *see also DL v. District of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013) ("In the absence of identification of a policy or practice that affects all members of the class in the manner *Wal-Mart* requires, the district court's analysis is not faithful to the Court's interpretation of Rule 23(a) commonality."); *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 498 (7th Cir. 2012) (vacating class certification order because IDEA plaintiffs did not offer proof that the school system operated under an illegal policy). As those courts have explained, whether a child has been denied a FAPE "is the bottom-line liability question in any individual plaintiff's IDEA claim." *Jamie S.*, 668 F.3d at 497. But "[a]fter *Wal-Mart* it is clear that defining the class by reference to [a school district's] pattern and practice of failing to provide FAPEs speaks too broadly because it constitutes only an allegation that the class members 'have all suffered a violation of the same provision of law,'" which is "insufficient to establish commonality." *DL*, 713 F.3d at 126 (quoting *Wal-Mart*, 564 U.S. at 350).

Applying this rule, the Seventh Circuit held that a class of "students eligible for special education services" who have been or will be "denied or delayed entry or participation" in the IEP process failed the commonality prerequisite. *Jamie S.*, 668 F.3d at 495, 497–498. As framed, the class was focused on alleged violations of the IDEA's "child find" requirements. *Id.* at 485; *see also* 20 U.S.C. § 1412(a)(3)(A) (mandating that all children with disabilities residing in the State be identified, located, and evaluated). But the Seventh Circuit found the case "unsuitable for class-action treatment" because the

15

claims were "highly individualized and vastly diverse." *Jamie S.*, 668 F.3d at 486. For example, the class included children who were eligible for special education but had never been identified by the school district as well as children who had been identified but whose parents didn't attend their IEP meeting because they lacked notice. *Id.* at 498. No common question would drive the resolution of both claims; instead, resolving each child's claim would require an "inherently particularized inquiry into the circumstances of the child's case." *Id.* As the court explained, it was not sufficient that "all the class members have suffered as a result of disparate individual IDEA child-find violations." *Id.* at 497 (internal quotation marks omitted). Rather, "the plaintiffs must show that they share some question of law or fact that can be answered *all at once* and that the *single answer* to that question will resolve a central issue in all class members' claims." *Id.* The Seventh Circuit recognized that "an illegal *policy* might provide the 'glue' necessary to litigate otherwise highly individualized claims as a class," but found no proof of an illegal policy in that case. *Id.* at 498 (quoting *Wal-Mart*, 564 U.S. at 352).

The D.C. Circuit similarly vacated certification of a class of "[a]ll children" eligible for special education "whom defendants did not [or will not] identify, locate, evaluate, or offer special education and related services to" when the children were between three and five years old. *DL*, 713 F.3d at 123. Like the Seventh Circuit, the D.C. Circuit held that this class could not meet the commonality prerequisite because "the harms alleged to have been suffered by the plaintiffs . . . involve[d] different policies and practices at different stages of the District's Child Find and FAPE process," and "the district court identified no single or uniform policy or practice that bridges all their claims." *Id.* at 127. For some

16

children, the alleged harm was due to an ineffective "intake and referral process"; for others, the alleged harm was caused by failure to adequately implement IEPs; and for still others, the cause was "the absence of a smooth and effective transition" from one program to another. *Id.* at 128. "[I]n the absence of a uniform policy or practice that affects all class members," the court concluded, there was no common question that would assist the district court in determining liability for all class members.[7] *Id.*

Likewise, the First Circuit in *Parent/Professional Advocacy League* affirmed the district court's order denying certification of a class of "all students with a mental health disability who are or have been" educated in an alternative school designed for students with social emotional behavioral disabilities. 934 F.3d at 21 (internal quotation marks and brackets omitted). Alleging violations of the IDEA and the ADA, the plaintiffs relied on an expert report "find[ing] a pattern of legal harm common to the class." *Id.* at 30. But the First Circuit considered that evidence insufficient to satisfy the commonality requirement because it did not "identify[] a particular driver . . . of that alleged harm," i.e., "'a uniform policy or practice that affects all class members.'" *Id.* (quoting *DL*, 713 F.3d at 128). "Absent such a common driver," the court explained, whether a given student's placement at the alternative school unlawfully segregated the student or provided unequal education

---

[7] On remand, the district court divided the proposed class into four subclasses that were "tied to separate phases of the Child Find process." *DL v. District of Columbia* (*DL II*), 860 F.3d 713, 719, 724 (D.C. Cir. 2017). On appeal, the D.C. Circuit affirmed certification of three of those subclasses, explaining that each subclass was "defined by reference to a 'uniform policy or practice' governing a specific stage of the special education process." *Id.* at 724 (quoting *DL*, 713 F.3d at 127).

17

benefits would "depend on that one student's unique disability and needs." *Id.* at 31. Accordingly, the class lacked the commonality necessary for certification.

By contrast, the First Circuit took note of classes in other cases that had been held to satisfy the commonality requirement of Rule 23(a). For example, it observed that a class had been certified to challenge a school district's policy of delaying the start of services offered in IEPs, like speech therapy, until two weeks into the school year. *Id.* at 29 (discussing *R. A-G v. Buffalo City Sch. Dist. Bd. of Educ.*, No. 12-cv-960S, 2013 WL 3354424, at *11 (W.D.N.Y. July 3, 2013), *aff'd*, 569 Fed. App. 41 (2d Cir. 2014) (per curiam)). The common question there was whether delaying the start of services violates the IDEA. Answering that question was apt to drive the resolution of all class members' claims because the challenged policy was alleged to "preclude[], across-the-board, the individualized . . . services that the IDEA requires," resulting in the denial of services for every student in the class. *Id.*

We agree with our sister circuits that, to meet the commonality prerequisite for class certification, plaintiffs in an IDEA case like this one must identify a "uniformly applied, official policy of the school district, or an unofficial yet well-defined practice, that drives the alleged violation." *Id.* The typical IDEA lawsuit involves a highly individualized assessment of whether a child was denied a FAPE. In a suit challenging hundreds of individualized special education decisions, satisfying the commonality prerequisite requires proof of some common driver—the "'glue'" holding all those decisions together in a way that suggests they can productively be litigated all at once. *Jamie S.*, 668 F.3d at 498 (quoting *Wal-Mart*, 564 U.S. at 352); *see also Parent/Pro. Advoc. League*, 934 F.3d

18

at 29.  "[A] uniform policy or practice that affects all class members" can supply this connection, *DL*, 713 F.3d at 128, by "anchor[ing] common questions . . . the answers to which could 'resolve an issue that is central to the validity of each one of the claims in one stroke,'" *Parent/Pro. Advoc. League*, 934 F.3d at 29 (quoting *Wal-Mart*, 564 U.S. at 350).

B.

Applying these principles, we turn to the present case.  The district court certified a class of "[a]ll Kanawha County Schools students with disabilities who need behavior supports and have experienced disciplinary removals from any classroom."  *G.T.*, 2021 WL 3744607, at *9.  This class includes students with any of the disabilities covered by the IDEA, the ADA, or the Rehabilitation Act who need individualized behavior supports and were removed from a classroom for misbehavior.

We conclude that this class fails to satisfy Rule 23(a)(2)'s commonality requirement because Plaintiffs do not identify a common contention central to the validity of all class members' claims.  Plaintiffs assert that all class members are harmed "in the same manner" because the Board deprived them of "the educational services to which they are entitled by federal law" and "subjected them to disability-based discrimination."  J.A. 37.  But it is not enough that "they have all suffered a violation of the same provision of law."  *Wal-Mart*, 564 U.S. at 350.  As we will explain, the class members' claims are highly diverse and individualized, and Plaintiffs have not identified a "single or uniform policy or practice that bridges all their claims."  *DL*, 713 F.3d at 127.  The district court acknowledged that "Plaintiffs cannot point to a single policy" that underlies all class members' claims.  *G.T.*, 2021 WL 3744607, at *14.  Nor do Plaintiffs identify "a well-defined practice (or set of

19

practices) that is consistently and uniformly applied" which drives each class member's claim. *Parent/Pro. Advoc. League*, 934 F.3d at 29. The absence of a common contention forecloses class treatment.

First, Plaintiffs' claims are "vastly diverse," as their alleged harms involve different practices at different stages of the special education process. *Jamie S.*, 668 F.3d at 486. Plaintiffs' asserted common questions illustrate the problem. According to Plaintiffs, one common question is whether the Board failed to "identif[y] students with disabilities who need behavior supports." *G.T.*, 2021 WL 3744607, at *12. We need look no further than the class representatives to see why this question is not common to the entire class. Both G.T. and K.M. were identified as needing behavior supports and were provided such supports. Answering this question would have no bearing on their claims for relief. Indeed, Plaintiffs' attorney conceded at oral argument that failure to identify students was not a common contention for the class. Oral Arg. at 29:43–30:25.[8]

---

[8] Here is the relevant exchange in context:

A: Here we have a much narrower class because it just relates to individuals who need behavior supports who've been excluded. So it's not trying to say everyone; it's very targeted at the behavior supports issue specifically.

Q: No, you have students who haven't been identified as needing behavior supports and students who have . . . but haven't received them in a certain way or who have received them but haven't been monitored. It's . . . more targeted than some of these, but it's still a pretty big . . . diverse group.

A: *I agree with that with respect to identification.* I think that there is certainly an argument that you could have . . . a subclass of individuals who have not yet been identified and that *those are—that's slightly distinct from the rest.* I mean the rest of the class are individuals who are currently, our

Plaintiffs' other asserted questions fare no better. They include whether the Board properly develops and implements behavior supports, whether it sufficiently monitors students who are prescribed behavior supports, and whether it adequately trains staff responsible for providing behavior supports. Those questions are not common to all class members' claims but are instead steps in the special education process at which different children are affected. For example, the claims of children who need behavior supports but were never identified by the Board are not advanced by answering questions about the Board's processes for developing behavior supports after identification, monitoring progress after those supports are implemented, or training the staff who administer those supports.

Like the class claims in *Jamie S.* and *DL*, Plaintiffs' "claims appear to be based on multiple, disparate failures to comply with the [Board's] statutory [special education] obligations" rather than a "policy or practice which affects them all." *DL*, 713 F.3d at 128 (internal quotation marks omitted). For one child the IEP team may have failed to create a behavior intervention plan with behavior supports; for another, the IEP may have included behavior supports, but the supports were inadequate; and for still another, the school district

---

allegation is, are not having their behavior supports properly implemented, monitored, and . . . they're subject to inadequate training. I don't think, you know, in *DL*, there was sort of no overlap between the classes. I think that here there would be, I think, overlap between all of those things, that's basically everyone in the class, *except for the people who have not yet been identified*.

Oral Arg. at 29:12–30:17 (emphases added).

21

may have developed adequate supports but then failed to monitor the child's progress. What common question can be answered that would assist the district court in determining the Board's liability as to each? There is none.

Second, answering many of Plaintiffs' proposed questions "requires individualized determinations which defeat commonality." *Parent/Pro. Advoc. League*, 934 F.3d at 31. For example, one proposed question is whether the Board adequately "develops and implements" behavior supports for children with disabilities who need them. *G.T.*, 2021 WL 3744607, at *12. Plaintiffs have never alleged that the Board has a well-defined practice of refusing to develop or implement behavior supports for a particular group of children or refusing to develop or implement certain types of supports for any children. Without a defined policy or practice, resolving whether the Board adequately developed and implemented behavior supports for any individual class member will depend on that particular child's unique needs and IEP goals. *See* Policy 2419, at 12 (explaining behavior intervention plans).

Another proposed question is whether the Board "avoids unjustified disciplinary removals from the classroom." *G.T.*, 2021 WL 3744607, at *12. Plaintiffs have identified no policy or well-defined practice regarding disciplinary removals that has been applied to every class member. Absent such policy or practice, deciding whether one child's removal from the classroom in a specific instance was justified "requires an inherently particularized inquiry into the circumstances of the child's case." *Jamie S.*, 668 F.3d at 498; *see also, e.g.*, 20 U.S.C. § 1415(k)(1)(A) (authorizing school personnel to consider a child's "unique circumstances on a case-by-case basis" in determining whether to order a

22

placement change for a disabled child who violates a code of conduct).  Without a uniformly applied well-defined practice, "[t]here is no such thing as a 'systemic' failure" to provide adequate behavioral supports or to avoid unjustified disciplinary removals.  *See Jamie S.*, 668 F.3d at 498.  Each child's claims depend on his or her unique needs and circumstances.

In concluding otherwise, the district court abused its discretion.  The court relied on a "pattern" of problems that Plaintiffs' expert identified in her review of a sample of student records, such as "inadequate attention to root causes of behavior," misclassification of disability eligibility categories, "failure to collaborate with parents" in designing effective behavior intervention plans, "failure to consistently implement" behavior supports, and failure to adjust plans over time to reflect changing student needs.  *G.T.*, 2021 WL 3744607, at *13.  Our sister circuits have consistently rejected similar reliance on an asserted pattern of individualized deficiencies to prove the existence of a common question for class certification.  *See Parent/Pro. Advoc. League*, 934 F.3d at 30; *DL*, 713 F.3d at 126; *Jamie S.*, 668 F.3d at 488.  As in those cases, none of the shortcomings or patterns identified by Plaintiffs' expert demonstrate the existence of a "common contention" whose "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 564 U.S. at 350.

Because Plaintiffs did not identify "'a uniform policy or practice'" that drives the alleged harm to all class members, they failed to demonstrate compliance with the commonality requirement of Rule 23(a).  *Parent/Pro. Advoc. League*, 934 F.3d at 30

23

(quoting *DL*, 713 F.3d at 128).  Therefore, certification of Plaintiffs' proposed class was improper.[9]

C.

On appeal, Plaintiffs pivot to contend that they are challenging the Board's failure to enact policies the IDEA requires.  They claim that the IDEA requires the Board to establish policies addressing specific topics—(1) identifying students with disabilities who need behavioral supports, (2) implementing behavioral supports, (3) monitoring their

---

[9] Without citing any legal authority, the dissenting opinion theorizes that the IDEA authorizes substantive relief whenever a school's conduct "poses a *substantial risk* of denying [a student] a free appropriate public education."  Diss. Op. 43 (emphasis added); *see also* Diss. Op 35–36.  That merits thesis wanders far afield from the parties' certification arguments, so we hesitate to spend much time on it.  However, we feel compelled to briefly respond.

Far from encouraging proactive federal-court interference with the judgments of state and local educators, the IDEA requires parents and students to pursue their complaints first in a state administrative process, where a hearing officer is authorized to grant relief based on "a determination of whether the child *received* a [FAPE]."  20 U.S.C. § 1415(f)(3)(E)(i) (emphasis added); *Sanchez v. Arlington Cnty. Sch. Bd.*, 58 F.4th 130, 133 (4th Cir. 2023).  This statutory inquiry consistently operates in the past tense.  *See* 20 U.S.C. § 1415(f)(3)(E)(i)–(ii) (authorizing hearing officer to consider whether a procedural violation "*impeded* the child's right to a [FAPE]," "significantly *impeded* the parents' opportunity to participate," or "*caused* a deprivation of educational benefit" (emphases added)).  Afterward, a party aggrieved by the hearing officer's decision can sue "with respect to the complaint" presented to the hearing officer, and the court will make "its [own] decision" and grant appropriate relief.  *Id.* § 1415(i)(2).  That decision addresses the same question as the hearing officer's decision: "whether the child *received* a [FAPE]."  *Id.* § 1415(f)(3)(E)(i) (emphasis added); *see also Fry*, 137 S. Ct. at 754 n.7 ("[A] court in IDEA litigation may provide a substantive remedy only when it determines that a school *has denied* a FAPE." (emphasis added)); *Luna Perez v. Sturgis Pub. Schs.*, 143 S. Ct. 859, 865 (2023) (same); *R.F.*, 919 F.3d at 248 (same).  Neither statutory text nor precedent authorizes federal courts to order relief under the IDEA based on the "risk that [a student] will be denied their right to" a FAPE.  Diss. Op. 36.

efficacy, and (4) training personnel—and that the Board's failure to enact any policy, or an adequate policy, on a topic is itself an IDEA violation.  We need not entertain this new argument, as "[i]t is well established that this court does not consider issues raised for the first time on appeal, absent exceptional circumstances."[10] *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020) (internal quotation marks and brackets omitted).

Even if we considered Plaintiffs' new argument, it would fail for the same reasons we have already explained.[11]  Assume Plaintiffs were correct that the entire class was subject to an allegedly unlawful absence of these policies.  That contention would raise only "superficial common questions" that do not drive resolution of the litigation.  *Jamie S.*, 668 F.3d at 497.  As the Supreme Court explained in *Wal-Mart*, some common questions—like "Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have

---

[10] The dissent disagrees, but its record citations prove our point.  *See* Diss. Op. 39 n.8.  In the district court, Plaintiffs argued that the Board, through inadequate policies and practices, "fail[ed] to provide effective behavior supports," resulting in "disciplinary removals of students with disabilities from the classroom," which "deprived the Plaintiff class of the educational services to which they are entitled by federal law."  J.A. 37; *see also* J.A. 36 ("[T]he B[oard]'s failure to provide effective behavior supports and resulting disciplinary removals of students with disabilities violates the IDEA . . . .").  On appeal, Plaintiffs contend that the Board's failure to "establish policies" on certain topics *itself* "constitutes a violation of the IDEA."  Response Br. 26; *see also* Response Br. 38 (arguing that the Board harms all class members "by depriving them of the policies Congress has deemed they require").  Those are "fundamental[ly]" different questions, not just "two variations of the same basic argument."  *In re Under Seal*, 749 F.3d 276, 288 (4th Cir. 2014).

[11] The Board vigorously disputes whether the IDEA imposes the obligation to enact these policies on the school district, as opposed to the State.  *See* 20 U.S.C. §§ 1412(a), 1413(a)(1); *see also* Policy 2419 (West Virginia's policy and procedures manual).  Resolving that dispute would not change the outcome of this appeal, so we assume without deciding that the Board has some obligation.

discretion over pay? Is that an unlawful employment practice? What remedies should we get?"—are "not sufficient to obtain class certification" because they do not "demonstrate that the class members . . . suffered the same injury." 564 U.S. at 349–350 (internal quotation marks omitted). So too here. Without more, the assertion that all class members were subject to the same inadequate policies is insufficient because their individual claims of harm stem from different alleged policy failures.

Consider two hypothetical students: the first never had behavioral supports implemented, the second had behavioral supports implemented but their efficacy was not monitored because of a lack of training. What is the common contention between them? Plaintiffs would say it is a failure to have adequate policies addressing each situation. But each hypothetical student's harm was a result of a different alleged policy failure. *See Jamie S.*, 668 F.3d at 497. So, even if we considered Plaintiffs' new challenge on appeal, it suffers the same commonality problems as the claims litigated in the district court.

IV.

Because the certified class does not comply with Rule 23(a)(2), we reverse the district court's certification order and remand for further proceedings consistent with this opinion.[12]

---

[12] On remand, the district court may consider whether redefining the proposed class—such as by establishing smaller subclasses—can satisfy Rule 23's commonality requirement. *See DL*, 713 F.3d at 129 ("We remand the case to the district court for reconsideration of whether a class, classes, or subclasses may be certified . . . ."); *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 72–73 (2d Cir. 2007) ("[O]ur . . . decision reversing the District Court's grant of [Plaintiffs'] motion for class certification" does not "preclude[][Plaintiffs] from returning to the District Court to seek certification of a more

26

*REVERSED AND REMANDED*

---

modest class, one as to which the Rule 23 criteria might be met, according to the standards we have outlined," because "[d]istrict courts have ample discretion to consider (or to decline to consider) a revised class certification motion after an initial denial."). We take no position on the certifiability of a potentially redefined class.

WYNN, Circuit Judge, concurring in part and dissenting in part:

Students with disabilities who attend schools overseen by the Board of Education of the County of Kanawha, West Virginia ("the Board of Education"), "are suspended at a disproportionate rate compared to their peers without disabilities." *G.T. ex rel. Michelle v. Bd. of Educ. of Kanawha*, No. 2:20-CV-00057, 2021 WL 3744607, at *9 (S.D.W. Va. Aug. 24, 2021). Many of those suspensions are allegedly unwarranted, meaning that they violate the students' rights to a free appropriate public education in the least restrictive environment. And the suspensions are, Plaintiffs claim, indicative of the Board of Education's broader failure to provide the quality of education that the Individuals with Disabilities Education Act ("IDEA") guarantees.[1]

The Board of Education's conduct has sweeping implications: every student with a disability whose schooling the Board of Education oversees is at risk of being denied their IDEA-guaranteed right to a free appropriate public education.

That common risk would not on its own provide the basis for class certification. But common risk that derives from a discrete set of policy failures can support class certification. And, here, Plaintiffs point to several actions or omissions that each impose risk on every class member. Namely, Plaintiffs allege that the Board of Education has failed to enact legally required policies about how to identify students with disabilities who need behavioral supports, how to implement behavioral supports, how to monitor the progress

---

[1] Plaintiffs also brought claims under the Americans with Disabilities Act, the Rehabilitation Act, and the West Virginia Human Rights Act. *See* J.A. 63–68. I follow the district court and majority opinion in focusing on Plaintiffs' IDEA claims.

28

of students who are prescribed behavioral supports, and how to train staff members responsible for providing behavioral supports. And an injunction requiring the Board to enact policies in each of those areas would reduce the risks that every class member faces.

Anticipating the need for such relief, the IDEA permits injunctive suits to ameliorate threats to a student's substantive rights before the student suffers actual harm. In line with that straightforward understanding of the IDEA, Plaintiffs have repeatedly emphasized that they are suing to eliminate risks that threaten all class members' rights to a free appropriate public education in the least restrictive environment. That sort of risk-reduction theory is standard in Rule 23(b)(2) class actions and could support class certification under the IDEA given the right findings.

But while the district court correctly recognized that Plaintiffs are seeking to mitigate a risk of harm that all class members share, it did not address whether the named plaintiffs had a sufficient risk of harm to support standing as to each of the policy failures they challenge. I therefore would vacate the district court's order and allow it to address that issue in the first instance.

* * *

Because the key flaw in the majority opinion derives from a misunderstanding of the type of claims that may be brought under the IDEA, I start there. I first explain what substantive and procedural rights the IDEA grants. I go on to explain how standard principles of injunctive relief mean that students may sue to proactively eliminate risks to their substantive IDEA rights. I then address how the majority opinion's flawed understanding of these principles leads it to misunderstand Plaintiffs' claims in this case

29

and how Plaintiffs' claims, when properly understood, are targeted at eliminating risks to class members' substantive IDEA rights that derive from a common source. I last elaborate on why I would require the district court to make additional findings related to standing.

I.

A.

The majority opinion accurately summarizes most of the relevant IDEA provisions, *see* Maj. Op. at 3–8, so I provide an abbreviated discussion of the statute to highlight several additional provisions that are relevant to this case.

When it enacted the IDEA, Congress found that "millions of children with disabilities" were being "excluded entirely from the public school system and from being educated with their peers." 20 U.S.C. § 1400(c)(2). To remedy this problem, the IDEA provides federal funds to assist states and local agencies in educating children with disabilities. *See id.* § 1412; *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295–96 (2006).

The funds are conditioned on there being "in effect policies and procedures" to ensure children have access to a "free appropriate public education." 20 U.S.C. § 1412(a). Through that requirement, the IDEA not only constrains states and schools, but also "establishes a substantive right to a 'free appropriate public education' for certain children with disabilities." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982)).

Students also have the right for that free appropriate public education to be provided in the "[l]east restrictive environment." 20 U.S.C. § 1412(a)(5). That means children with disabilities must be "educated with children who are not disabled" "[t]o the maximum extent appropriate" and that "removal of children with disabilities from the regular educational environment [must] occur[] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* § 1412(a)(5)(A).

B.

In addition to providing students with substantive rights, the IDEA also provides students and their parents or guardians with a panoply of procedural rights. *See R.F. ex rel. E.F. v. Cecil Cnty. Pub. Schs.*, 919 F.3d 237, 245 (4th Cir. 2019) ("Whether a state has violated the IDEA has procedural and substantive components."); *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 527 (4th Cir. 2002) ("The IDEA establishes a series of elaborate procedural safeguards 'designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to these decisions.'" (quoting *Gadsby ex rel. Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997))). For example, "[t]he IDEA requires that the parents or guardian of a disabled child be notified by the school district of any proposed change to their child's" Individual Education Plan ("IEP"), and "the parents or guardian [must] be permitted to participate in discussions relating to their disabled child's evaluation and education." *MM*, 303 F.3d at 527; *see* 20 U.S.C. § 1415(b).

31

As the Supreme Court has explained, the IDEA's "procedures are there for a reason, and their focus provides insight into what it means, for purposes of the [free appropriate public education] definition, to 'meet the unique needs' of a child with a disability." *Endrew F.*, 580 U.S. at 402 (quoting 20 U.S.C. § 1401(29)). "And it is possible for a school district's failure to abide by the IDEA's procedural requirements to constitute an adequate basis for contending that the district has failed to provide a disabled child with a [free appropriate public education]." *MM*, 303 F.3d at 533.

To ensure that students and their parents or guardians can enforce the rights granted by the IDEA, the IDEA provides that "[a]ny . . . local educational agency that receives assistance under [the IDEA] shall establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education." 20 U.S.C. § 1415(a). Those procedures must include "[a]n opportunity for any party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.* § 1415(b)(6).

Such complaints are adjudicated in an administrative "due process hearing." *Id.* § 1415(f). And "[a]ny party aggrieved by the findings and decision made" in the

administrative due process hearing "shall have the right to bring a civil action with respect to the complaint presented" in the hearing.[2] *Id.* § 1415(i)(2)(A).

If, in an ensuing suit, a federal court finds that a defendant has violated the IDEA, the IDEA directs that the court "shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C)(iii). Most often, the relief "appropriate" under the IDEA is injunctive relief. *See, e.g.*, *G ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 309 (4th Cir. 2003) (discussing how the "discretionary, prospective, injunctive relief" available under the IDEA includes an award of future "[c]ompensatory education"); *Reid v. Prince George's Cnty. Bd. of Educ.*, 60 F. Supp. 3d 601, 606 (D. Md. 2014) (recognizing that "the principal form of relief under the IDEA is prospective benefits"); *cf. Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 374 (1985) (stating that "equitable considerations are relevant in fashioning relief" under the IDEA); *Sellers ex rel. Sellers v. Sch. Bd. of Manassas*, 141 F.3d 524, 525 (4th Cir. 1998) (recognizing that the "IDEA does not provide for compensatory or punitive damages").[3]

With that in mind, I turn to briefly explain the types of harms for which a plaintiff may typically seek injunctive relief.

---

[2] If an administrative due process hearing is conducted by a local educational agency, the complainant has a right to appeal that decision to the state educational agency, and they must generally do so before filing suit in federal court. *See* 20 U.S.C. §§ 1415(g)(1), (i)(2)(A).

[3] Retroactive reimbursement of costs incurred by parents or guardians compensating for a school's failure to provide a free appropriate public education are not considered to be "damages" in this context and are therefore deemed recoverable. *Sch. Comm. of Burlington*, 471 U.S. at 370–71.

C.

"The purpose of an injunction . . . is to prevent future harms rather than redress those that have already occurred." *Erie Ins. Exch. v. Md. Ins. Admin.*, 105 F.4th 145, 150 (4th Cir. 2024).

To warrant injunctive relief, a plaintiff must generally establish "the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). Past harms may serve as "evidence bearing on 'whether there is a real and immediate threat of repeated injury.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea*, 414 U.S. at 496).

But because injunctive relief is forward-looking, a plaintiff need not show that they have already been harmed in order to seek an injunction. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000). Instead, "[t]hreats or increased risk . . . constitutes cognizable harm" for which an injunction may be sought. *Id.*[4]

Having separately provided an overview of the IDEA and of the types of claims for which injunctive relief may be sought, I turn to address the majority opinion's first error, which relates to what a plaintiff must show when seeking injunctive relief under the IDEA.

---

[4] Some of the cases cited in this section focus on the requirements for establishing Article III standing. But the same "considerations obviously shade into those determining whether the complaint states a sound basis for equitable relief." *O'Shea*, 414 U.S. at 499. I separately address the requirements for standing in Section III.

II.

A.

The majority opinion makes a fundamental mistake in its description of what an IDEA plaintiff must prove to establish a claim for injunctive relief. The majority opinion firmly states that "whether a child *has been denied* a [free appropriate public education] 'is the bottom-line liability question in any individual plaintiff's IDEA claim.'" Maj. Op. at 15 (emphasis added) (quoting *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012)); *see also id.* at 24 n.9 (elaborating on the majority opinion's view that students cannot proactively seek injunctive relief to prevent the denial of their right to a free appropriate public education). Not so.

Instead, when a student seeks injunctive relief under the IDEA, the bottom-line liability question is whether the defendant has placed the student's right to a free appropriate public education at substantial risk. As in the typical suit for injunctive relief, past harm may be sufficient to prove the existence of substantial risk, but it is not necessary to prove it.[5]

---

[5] Our case law has recognized that when a school violates a student's procedural rights, we must determine whether that violation impacted the student's substantive rights or if "it was a mere technical contravention of the IDEA." *MM*, 303 F.3d at 533. If a procedural violation does not impact the student's substantive rights, "the school district has fulfilled its statutory obligations" and is therefore not liable under the IDEA. *Id.* at 534; *see, e.g.*, *Gadsby*, 109 F.3d at 956 (4th Cir. 1997) (holding that even if a failure to provide notice constituted a procedural violation, "there is no evidence that the State's failure to notify the [parents] resulted in any interference with the provision of a free appropriate public education to [the child]"). Our decisions in those cases arise in the context of one-off procedural violations, such as when a school fails to provide notice of an upcoming change to a student's IEP. *See, e.g.*, *Burke Cnty. Bd. of Educ. v. Denton ex rel. Denton*, 895

35

Consider a hypothetical student with a disability who needs behavioral supports and attends school in a district that has failed to enact a policy on how to implement behavioral supports and that, as a result, has failed to properly implement behavioral supports for even a single student who needs them. Even if the student has just been timely identified as needing behavioral supports, the student still has good reason to worry that the Board of Education's policy will soon result in a deprivation of their promised education. But the majority's requirement that a student have *already* been denied their IDEA rights would prevent the student from proactively seeking injunctive relief. I find it inconceivable that this hypothetical student—or similar students in school districts with bad, but not quite as abysmal track records—would not be able to sue for injunctive relief to prevent that harm. But that is what the majority opinion claims the IDEA requires.

If we applied the same baseline rules to the IDEA that we apply to suits for injunctive relief regarding other rights, we would say that a student could sue a local educational agency for injunctive relief if either (1) the student has already been denied their free appropriate public education and continues to face the threat of being denied that education, or (2) the student has not yet been denied a free appropriate public education but faces a substantial risk that they will be denied their right to that education.

---

F.2d 973, 976, 982 (4th Cir. 1990); *T.B., Jr. ex rel. T.B., Sr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 573 (4th Cir. 2018). In such cases, it is possible to determine whether a procedural violation did cause substantive harm—for example, whether a failure to provide notice about an IEP change led to different substantive plans in the IEP. But when a procedural violation, such as a failure to enact legally required policies, poses an ongoing threat to a student's rights, the same is not true. Our case law about harmless procedural errors therefore does not require proof of past harms in all IDEA cases.

The majority opinion's failure to recognize this second category of cases leads it to misunderstand Plaintiffs' claims in this case, which I address next.

B.

The main purpose of Plaintiffs' lawsuit is to obtain injunctive relief that would end the Board of Education's alleged "systematic failure to provide effective behavior supports and its subsequent [unnecessary] disciplinary removals of students with disabilities from the classroom." J.A. 37.[6] And, as I have explained, because Plaintiffs seek injunctive relief, we must analyze their claims with an eye toward what "future harms" they seek to prevent, rather than what past harms they have already suffered. *Erie Ins. Exch.*, 105 F.4th at 150.

Plaintiffs' approach to proving their claim for injunctive relief is best understood as proceeding in three steps. First, Plaintiffs explain that the Board of Education has routinely denied students the free appropriate public education guaranteed by the IDEA. Second, Plaintiffs explain that this routine denial of IDEA-guaranteed rights has been driven by a discrete set of actions and inactions. Third, Plaintiffs explain that the Board of Education's continued policy failures combined with its history of denying IDEA-guaranteed rights increases each class member's risk that they will be denied a free appropriate public education in the future.

i.

At the first step, Plaintiffs have put forth allegations and evidence pertaining to (1) patterns of past harms, and (2) individual examples of harm. For example, the district court

---

[6] "J.A." refers to the Joint Appendix filed by the parties in this appeal.

discussed Plaintiffs' evidence of disparities in suspension rates between students with and without disabilities. *G.T.*, 2021 WL 3744607, at *3–4. And it also discussed evidence from Plaintiffs' expert witness report establishing that the Board of Education has a pattern of failing to identify students who need behavioral supports, failing to implement behavioral supports, failing to adequately monitor students with behavioral supports, and failing to adequately train staff about how to fulfill their duties under the IDEA. *See id.* at *4–5.

The named plaintiffs built on that evidence by offering their personal stories as concrete examples of how the Board of Education's actions and omissions have allegedly denied students a free appropriate public education. *See id.* at *7–8.

ii.

At the second step, Plaintiffs point to the Board of Education's "policies, practices, procedures, acts, and omissions" as the underlying causes of the pattern of harm they identified. J.A. 37. While Plaintiffs do not "point to a single policy" that explains the entire pattern of harm, *G.T.*, 2021 WL 3744607, at *14, they do identify a discrete set of alleged

38

policy failures that each contributed to the pattern.[7] Importantly, Plaintiffs have explained

that the Board of Education has failed to enact four legally required policies.[8]

---

[7] The Board of Education spends much of its appellate briefing arguing that "the IDEA does not require [the Board of Education] to enact policies as Plaintiffs claim." Reply Br. at 2. That may ultimately be a winning argument on the merits, but we lack authority to address it at this stage. "Rule 23 does not give . . . courts a 'license to engage in free-ranging merits inquiries at the certification stage.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). Instead, we may only consider merits questions to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (quoting *Amgen Inc.*, 568 U.S. at 466). The question of whether the IDEA requires the Board of Education to enact a given policy will yield the same answer regardless of which class member asks the question and regardless of whether the answer is yes or no. So, that merits question is irrelevant to our review of class certification.

[8] The majority opinion describes Plaintiffs' discussion of these policies as a "new argument," and considers it forfeited. Maj. Op. at 25. I disagree. A party generally forfeits an issue if it fails to raise it before the district court. *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020). But Plaintiffs repeatedly raised this argument before the district court. *See, e.g.*, J.A. 62 (quoted in main text of this opinion); J.A. 882 (stating that a prior Assistant Superintendent and Director of Special Education for the Board of Education "confirmed that the [Board of Education] does not have district-wide policies and practices for monitoring whether students who receive behavior supports make progress in their educational programs"); J.A. 879 (quoted in main text of this opinion); J.A. 1403 ("The Plaintiffs do not challenge the particular supports provided to any one student, but instead ask whether [the Board of Education] has policies and procedures in place to ensure that . . . students with disabilities receive the behavior supports they need[.]"); J.A. 1414 ("[T]here are no district-wide standards to guide schools and staff as to how to develop and implement [Behavior Intervention Plans], and . . . [the Board of Education] does not have district-wide procedures for monitoring the progress of students who receive behavior supports."); J.A. 1419 (discussing Plaintiffs' goal of obtaining "the type of systemic relief . . . where the remedy would be achieved solely through district-wide *policy* changes and would not include individualized compensatory education determinations" (emphasis added)).

Because Plaintiffs' appellate briefing merely elaborates on the issues already presented to the district court, they have not forfeited any of their arguments. *See United States v. Boyd*, 5 F.4th 550, 556 (4th Cir. 2021) (recognizing that a party may present variations on an argument if it is "ask[ing] both courts to evaluate the same fundamental

The first "act[]" or "omission[]" that Plaintiffs' complaint identified as the basis for their IDEA claims is the Board of Education's "fail[ure] to have in effect policies and procedures to ensure [it] provides a [free appropriate public education] to all eligible children in the district." J.A. 62. Plaintiffs elaborated on that concept when they identified six class-wide issues in their briefing before the district court. That list of six issues included the four policies on which they focus in this appeal: (1) "[w]hether the [Board of Education] has an adequate system and procedures for identifying students with disabilities who need behavior supports"; (2) "[w]hether the [Board of Education] has adopted appropriate systems and procedures for . . . identifying the causes of disruptive behavior . . . when developing behavior supports for students who need them," "developing and revising IEPs, Section 504 plans, and [Behavior Intervention Plans] for students with disabilities who need behavior supports," and "implementing IEPs, Section 504 plans, and [Behavior Intervention Plans] for students with disabilities who need behavior supports to receive [a free appropriate public education] in the [least restrictive environment]"; (3) "[w]hether the [Board of Education] has an adequate system and procedures for monitoring whether students with disabilities who receive behavior supports are making appropriate progress in their educational programs"; and (4) "[w]hether the [Board of Education] provides adequate training and professional development to staff so that they can provide behavior supports to students who need them to receive [a free appropriate public

_____

question" (quoting *In re Under Seal*, 749 F.3d 276, 288 (4th Cir. 2014))); *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) (holding that new "arguments" may be raised on appeal, so long as the "claim" they support was raised below).

education] in the [least restrictive environment]." J.A. 879; *see* Response Br. at 26–27 (listing the "four areas" on which Plaintiffs focus).

So, the Plaintiffs and district court have explained, "this case is not about the behavioral supports that should be provided to the individual students within the proposed class." *G.T.*, 2021 WL 3744607, at *14. Instead, it is about whether the Board of Education has failed to enact policies that would provide guidance on how to identify students with disabilities that need behavioral supports, how to implement behavioral supports, how to monitor the progress of students who are prescribed behavioral supports, and how to train staff members responsible for providing behavioral supports.

iii.

At the third step, Plaintiffs have alleged that the combination of the first two steps means that all class members face an ongoing risk of harm that could be mitigated by an injunction. It is a small logical step to conclude that, if the failure to implement a policy has contributed to a pattern of harm in the past and no policy has since been implemented, then students face a risk of harm going forward.

Plaintiffs' complaint takes that logical step by alleging that the Board of Education is "harm[ing] all class members in the same manner" because its conduct "increase[s] their risk of being subjected to" "disability-based discrimination" and denial of "educational services to which they are entitled by federal law." J.A. 37; *see* J.A. 36 ("Due to the [Board of Education's] policies, practices, procedures, acts, and omissions in failing to provide effective behavior supports to its students, [the named plaintiffs] and the Plaintiff class are

41

subjected to, *or are at substantial risk of being subjected to*, formal or informal disciplinary removals from school." (emphasis added)).

And the district court acknowledged that Plaintiffs' claims were based not only on past harms but also on the future risk of harm all class members face. In its discussion of the named plaintiffs' typicality, the district court recognized that even though the named plaintiffs were already identified as needing behavioral supports in response to some of their past behaviors, they "remain exposed to the inadequate procedures" and are therefore at risk of harm from misidentification in the future. *G.T.*, 2021 WL 3744607, at *15.

Having explained the Plaintiffs' risk-of-harm theory, I turn now to why that theory presents issues common to all class members regardless of whether they have previously been denied their IDEA rights.

## C.

"What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Applied to Rule 23(b)(2) class actions like this one, that means "[t]he key . . . is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Id.* at 360 (quoting Nagareda, *supra*, at 132).

42

As discussed above, the bottom-line question in determining liability in an IDEA case seeking injunctive relief is whether the defendant has placed the student's right to a free appropriate public education at substantial risk. So, we must determine whether the Board of Education's conduct poses a substantial risk of denying a free appropriate public education "only as to all of the class members or as to none of them." *Id.* Because students with disabilities may be impacted by any of the four policy failures Plaintiffs have identified, the increased risk from the lack of those policies also impacts every student. To explain why, I start by addressing why the Board of Education's failure to enact a policy providing guidance on how to identify students who need behavioral supports poses a risk to the named plaintiffs and to all other class members, regardless of whether they have previously been identified as needing behavioral supports.

When a local educational association works to identify whether a student needs behavioral supports, it is not attempting to make an end all, be all determination of whether behavioral supports are needed and, if so, what set of behavioral supports will always suffice to meet the student's needs. To the contrary, an institution can only be expected to identify whether a student currently needs behavioral supports and what supports will meet the student's needs in the present moment. A *prior* finding that a student's behaviors indicated a need for behavioral supports does not eliminate the need to identify whether the student's *new* behaviors require a different set of behavioral supports.

As the district court explained, the named plaintiffs have already been identified as needing behavioral supports "due in part to the extensive advocacy of their parents and others involved in this litigation." *G.T.*, 2021 WL 3744607, at *15. But that previous

43

identification does not exempt them from the risk that their future behaviors will be misidentified and that they will experience disciplinary removals in place of proper behavioral supports. In that way, the named plaintiffs "remain exposed to the inadequate procedures" and "[a]s they develop different challenging behaviors requiring a different set of responses and supports[,] . . . they, like other students with disabilities, will not be able to count on well-trained professionals carefully assessing their needs, designing a [Behavior Intervention Plan] responsive to those needs, ensuring that it is consistently implemented, and adjusting it as needed." *Id*.

All of this is the common-sense recognition that children grow, they learn, and their behaviors change. And when their behaviors change, educators must reassess and identify whether their new behaviors indicate a need for behavioral supports. As the named plaintiffs or any of the other class members undergo that iterative process, the Board of Education's alleged failure to enact a policy on how to identify students who need behavioral supports increases the risk that their need for new or additional supports will not be identified and that they will thereby be denied their IDEA rights.

The question of whether the IDEA mandates the policies that Plaintiffs allege "is an objective one" and "can be proved through evidence common to the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976)). And the Board of Education even recognized as much in its Reply Brief. *See* Reply Br. at 2 (stating that "[a]n injunction requiring the enactment of specific statutorily-required policies would satisfy Rule 23(b)(2)," but arguing that the Board of Education was not required to enact the policies relevant to

44

Plaintiffs' complaint). Moreover, "there is no risk . . . that a failure of proof on the common question[s] of" what the IDEA requires, whether the Board of Education has met those requirements, and, if not, whether its failure to meet those requirements imposes risk on all students with disabilities that had experienced disciplinary removals "will result in individual" determinations. *Amgen*, 568 U.S. at 467–68.

To the contrary, if the answer to the common question regarding whether the IDEA has been violated through the Board's failure to enact certain policies is "no," then that answer "would end the case for one and for all; no claim would remain in which individual . . . issues could potentially predominate." *Id.* at 468. And, alternatively, if the answer to that common question is "yes," then an injunction requiring the Board of Education to enact a policy providing guidance on how to identify students would be "indivisible"—and therefore common—because the same policy would apply to all students and would mitigate the chance that any given student would have their future behaviors misidentified. *Wal-Mart*, 564 U.S. at 362 (quoting Nagareda, *supra*, at 132).

Similar logic applies to each of the other three areas for which Plaintiffs claim the Board of Education has failed to enact legally required policies.[9] Take, for example, a

---

[9] In addition to rejecting the merits of Plaintiffs' argument, the majority opinion asserts that "Plaintiffs' attorney conceded at oral argument that failure to identify students was not a common contention for the class." Maj. Op. at 20 (citing Oral Arg. at 29:43–30:25). I understand counsel's statements at oral argument differently. In the portion of oral argument to which the majority opinion cites, Plaintiffs' counsel simply recognized one argument against their primary position that the identification policy presents common issues and offered an alternative resolution (subclasses) if the Court did not fully side with Plaintiffs' primary position. *See* Oral Arg. at 29:43–29:50 ("[W]ith respect to identification . . . I think there is certainly an argument that you *could* have a subclass of

45

student with a disability who has never been identified as needing behavioral supports. Of the four failures to enact policy that Plaintiffs have identified, the largest barrier to that student receiving a free appropriate public education is almost certainly the Board of Education's failure to enact a policy on identifying students who need behavioral supports. But the student still faces risk—and perhaps quite substantial risk—that they will be denied a free appropriate public education even if they are identified. Because the Board of Education has failed to enact policies about how to implement behavioral supports, how to monitor the progress of students with behavioral supports, or how to train staff to provide behavioral supports, that student faces several additional hurdles. Put another way, that hypothetical student faces risk due to *each* of the policy failures, just as all other class members do.

Even class members who have not yet been denied a free appropriate public education are at risk that the Board of Education's alleged failures to enact policy will lead

---

individuals that have not yet been identified and that is slightly distinct from the rest." (emphasis added)). I simply do not understand this exchange as providing a clear concession of an argument that Plaintiffs vigorously presented both before the district court and in their appellate briefs.

Further, even if Plaintiffs did concede that their contentions about identification are not common, that alone would still not defeat commonality. "[E]ven a single common question will do," so long as "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350, 359 (cleaned up). As addressed below, Plaintiffs' claims about implementation, monitoring, and training would all separately satisfy the commonality requirement even if their claims about identification did not.

46

to a denial of their right to a free appropriate public education.[10] Just as with the named plaintiffs and the hypothetical student discussed above, the lack of policies increases the risk that the student's behavioral supports will not be implemented correctly in the future, that their progress will not be properly monitored in the future, and that their future behaviors that indicate a need for updated behavioral supports will be misidentified and met with disciplinary removals. Because "[a] central agency does not parcel out its systemic deliberate indifference child by child," David Marcus, *The Persistence and Uncertain Future of the Public Interest Class Action*, 24 Lewis & Clark L. Rev. 395, 417 (2020), every student with a disability for whom the Board of Education is responsible faces a risk that their rights will be denied when the Board of Education fails to enact legally required policies.

To be sure, for any given policy change, some class members will benefit to a greater degree than will other class members. For example, the named plaintiffs' expert found that G.T.'s individual Behavior Intervention Plan "does not provide teachers with sufficient guidance on how to implement supports," *G.T.*, 2021 WL 3744607, at *7, so G.T. is likely to see a particularly large reduction in the risk that he will be denied his IDEA rights if the Board of Education enacts a policy on how to implement behavioral supports.

---

[10] This group consists of Kanawha County Schools students with disabilities who need behavioral supports and have experienced disciplinary removals from any classroom but who, at least so far, have been properly identified, had their behavioral supports properly implemented, had their progress properly monitored, and have had no disciplinary removals in violation of the IDEA.

47

But different degrees of risk reduction do not mean that the class lacks commonality. So long as the "heart" of class members' claims is the same, the claims need not all be "perfectly identical or perfectly aligned." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). G.T. and other class members all see at least some increased risk due to the Board of Education's failure to enact a given policy, so they satisfy Rule 23's commonality requirement.

D.

Having laid out how we should resolve the commonality issue in this case, it is worth highlighting where the majority opinion's misunderstandings lead it astray.

To do so, I begin with some common ground. The majority opinion's discussion of the general principles governing class certification is nearly spot-on. I agree with the majority's general statement, quoting the D.C. Circuit, that "'[a]fter *Wal-Mart* it is clear that defining the class by reference to [a school district's] pattern and practice of failing to provide [free appropriate public educations] speaks too broadly because it constitutes only an allegation that the class members "have all suffered a violation of the same provision of law,"' which is 'insufficient to establish commonality.'" Maj. Op. at 15 (quoting *DL v. D.C.*, 713 F.3d 120, 126 (D.C. Cir. 2013)).

I further agree with the general statement the majority opinion adopts from the Seventh Circuit that "[IDEA] plaintiffs must show that they share some question of law or fact that can be answered all at once and that the single answer to that question will resolve a central issue in all class members' claims." *Id.* at 16 (emphasis omitted) (quoting *Jamie S.*, 668 F.3d at 497). And I even agree with the majority opinion's core assessment that "to

48

meet the commonality prerequisite for class certification, plaintiffs in an IDEA case like this one must identify a 'uniformly applied, official policy of the school district, or an unofficial yet well-defined practice, that drives the alleged violation,'" *id.* at 18 (quoting *Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13, 29 (1st Cir. 2019))—though, I hasten to add, a *failure* to enact a legally required policy is one form of a uniformly applied, official policy.[11] *See* Opening Br. at 18–19 (Board of Education conceding that

---

[11] While I agree with most of the majority opinion's discussion of the general principles governing class actions, I offer one additional, key caveat to that discussion. The majority opinion correctly observes that the basic premise of class actions is that "litigation by representative parties adjudicates the rights of all class members." Maj. Op. at 12 (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998)). But, when combined with the majority opinion's description of this case as "challenging hundreds of individualized" determinations, *id.* at 18, the majority opinion seems to suggest that permitting this case to proceed as a class action would bar students from asserting that the Board of Education's actions toward them as individuals denied them access to their IDEA-guaranteed education. That suggestion is incorrect.

A class action does not preclude a class member from filing suit against the same defendant on a different claim. *See Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 880–82 (1984) (holding that resolution of a class action pertaining to whether employer engaged in a pattern or practice of discrimination did not preclude claims that employer discriminated against individual employees); Charles Wright, Arthur Miller & Mary Kay Kane, 7AA Fed. Prac. & Proc. Civ. § 1789 (3d ed. 2005 & Supp. 2024) (discussing preclusive effect of class-action judgments). A student may have multiple, distinct IDEA claims against a local educational agency. For example, the student may have (1) a claim about how the agency's policies are deficient and therefore place the student at risk of being denied a free appropriate public education, and (2) a claim about how the agency introduced an error into the student's IEP that has already led to a denial of a free appropriate public education. Those claims are distinct, and the plaintiff would not be barred from bringing the second claim even if the first had been rejected in a class action that included the student. *See Cooper*, 467 U.S. at 880–82; *cf. G.T.* 2021 WL 3744607, at *14 n.11 (recognizing that "[b]ecause the Plaintiffs do not assert individual claims or seek individual relief, there is no need for the [Board of Education] to formulate defenses as to the denial of a [free appropriate public education] for individual class members that would defeat a finding of commonality").

the holding in *Wal-Mart* provides no rational distinction between the application of an illegal policy and the failure to establish a legally required policy); *cf. Wal-Mart*, 564 U.S. at 352–53 (recognizing that an illegal policy may serve as the "glue" necessary to establish commonality).

But the majority opinion fails to recognize that the risk-of-harm allegations in this case satisfy the commonality standard it articulates.

In line with its flawed understanding of the IDEA, the majority opinion undersells the allegations in Plaintiffs' complaint by focusing on the ways in which individual class members have already been harmed by the Board of Education's policy failures. *See* Maj. Op. at 20–21. And because it conceives of Plaintiffs as litigating individual past instances of harm, the majority opinion categorizes this case as "a suit challenging hundreds of individualized special education decisions." *Id.* at 18.

But that ignores Plaintiffs' repeated assertions that they brought this case "to address systemic inadequacies in [the Board of Education's] special education program, not to obtain individualized relief." Response Br. at 20 (internal quotation marks omitted); *see* J.A. 858 (stating that Plaintiffs are challenging "the ongoing failure by" the Board of Education "to effectively address [its] *systemic failures* to provide needed behavior supports for students with disabilities" (emphasis added)); J.A. 1403 ("The Plaintiffs do not challenge the particular supports provided to any one student, but instead ask whether [the Board of Education] has policies and procedures in place to ensure that . . . students with disabilities receive the behavior supports they need[.]").

50

And the majority opinion's focus on past harms also leads it to miss that a student can face a risk of future harm from multiple policy failures simultaneously. For example, the majority opinion makes much to do about how some class members may have had their behavioral supports properly implemented while others did not, *e.g.*, Maj. Op. at 25–26, precisely because the majority opinion misunderstands how a plaintiff could bring an IDEA claim about the *risk* that their behavioral supports would not be implemented correctly. As explained in the previous section, even if a student had enough luck in the past for their behavioral supports to be implemented correctly or for them to be correctly identified as needing behavioral supports, that does not negate the risk that the Board of Education's failure to enact policies on those topics will cause their behavioral supports to be implemented incorrectly in the future or for new behaviors to be met with disciplinary removals rather than behavioral supports.

As one amicus law professor has noted elsewhere, this type of misunderstanding about risk-of-harm theories can lead courts to make merits determinations under the guise of Rule 23. *See generally* Marcus, *supra*, at 417–20, 430–31 (discussing risk-of-harm class actions). And that plays out in this case. The real disagreement between this opinion and that of the majority is not about what Rule 23 requires for plaintiffs to establish commonality. Instead, the disagreement is about whether "the Individuals with Disabilities in Education Act prohibit[s] 'systemic' violations redressable with structural changes to a school system, or [whether] it simply entitle[s] each individual child to an educational plan suitable to her particular circumstances." Marcus, *supra*, at 431 (footnote omitted).

51

In essence, the majority opinion proceeds as though plaintiffs solely alleged that the Board's policy failures led each class member to be denied their IDEA rights in the past. If that were all Plaintiffs had done, then the majority opinion might well be right that class certification would be inappropriate. But, crucially, Plaintiffs have alleged that the Board of Education has failed to enact legally required policies, that its failure to enact those policies has caused harm in the past, *and* that the history of harm means that all students with disabilities (and particularly those who have already experienced disciplinary removals) face a risk of harm in the future. The IDEA permits such claims, and they are necessarily common to the class the district court certified.

## III.

Even though I disagree with the majority opinion's conclusion about whether Plaintiffs have satisfied Rule 23's commonality requirement, I would nonetheless vacate the district court's opinion. While each class member faces some risk of harm from the Board of Education's alleged policy failures, the district court must address whether the risk of harm is sufficiently substantial to support standing.

As addressed above, injunctive relief must be targeted at a risk of future harm. *See* Section I.C. Related to that principle, a risk of future harm can establish standing to pursue injunctive relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 435–36 (2021) (recognizing that material risk of future harm can satisfy the standing requirements in the context of a claim for injunctive relief to prevent the harm from occurring if the risk of harm is sufficiently imminent and substantial); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (discussing the Supreme Court's "substantial risk" standing doctrine).

52

However, "not all threatened injuries constitute an injury-in-fact." *Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir. 2017). Instead, the Supreme Court has "found standing based on a 'substantial risk' that . . . harm will occur" when the risk "may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5. That means a plaintiff's injury must be "concrete in both a qualitative and temporal sense." *Beck*, 848 F.3d at 271 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

Our case law does not precisely define when a plaintiff's likelihood of injury is so substantial or imminent as to grant standing in cases seeking injunctive relief, but it does provide some guidance. In *Beck v. McDonald*, this Court held that a plaintiff's allegations of risk in a data-breach class action fell short of establishing standing for injunctive relief because the plaintiffs' risk-of-harm theory was "too speculative to constitute an injury-in-fact." *Beck*, 848 F.3d at 274. The *Beck* plaintiffs brought data-privacy claims against Department of Veterans Affairs officials after a laptop containing unencrypted patient data was stolen from a Veterans Affairs Medical Center. *Id.* at 267. The plaintiffs "sought to establish Article III standing based on the harm from the increased risk of future identity theft and the cost of measures to protect against it." *Id.* at 266–67. But "even after extensive discovery, the *Beck* plaintiffs . . . uncovered no evidence that the information contained on the stolen laptop ha[d] been accessed or misused or that they ha[d] suffered identity theft, nor, for that matter, that the thief stole the laptop with the intent to steal their private information." *Id.* at 274. Instead, the plaintiffs merely asserted that "33% of health-related data breaches result in identity theft" and that the defendants recognized the risks inherent in data breaches. *Id.* at 275. Without any suggestion that the laptop had been stolen with

53

the intention of breaching the data or that the data had in fact been accessed, the Court concluded that the chain of events necessary for the plaintiffs to face a "substantial" risk of harm was too attenuated to support standing.

By contrast, in *Hutton v. National Board of Examiners in Optometry*, we held that victims of a different data breach had "[a]t a minimum . . . sufficiently alleged an imminent threat of injury to satisfy Article III standing." *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 622 (4th Cir. 2018). While we have recognized that past harm is neither necessary nor sufficient to prove risk of future harm, the *Hutton* plaintiffs sufficiently alleged that they faced an imminent risk of harm because "fraudsters [had already] used—and attempted to use—the Plaintiffs' personal information." *Id.* So, there was "no need to speculate on whether substantial harm [would] befall the Plaintiffs" and we could be certain that their risk of future harm was in fact substantial. *Id.*

In addition to these guideposts about when a plaintiff's injuries are too speculative to qualify as a "substantial risk" of future harm, we have also suggested that the available remedies for an injury may factor into our analysis of standing. Specifically, as the Court noted in *Beck*, we may be more likely to hold that plaintiffs can pursue injunctive relief when their alleged harms are "'difficult or impossible to remedy' by monetary compensation." *Beck*, 848 F.3d at 274 n.5 (quoting *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002)).

Further, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734

54

(2008) (cleaned up). And while Plaintiffs' complaint contains only one IDEA count, their complaint is best understood as pursuing multiple "claims" for injunctive relief.

Throughout this litigation, Plaintiffs' overarching attempt to obtain relief from the Board of Education's "systematic failure" to fulfill its duties under the IDEA, J.A. 37, has required them to seek relief from several of the Board of Education's related but distinct failures. *See supra* Section II.B.ii. Specifically, Plaintiffs have discussed "four areas" of "deficient policies, procedures, and programs" that they are challenging. Response Br. at 26 (internal quotation marks omitted). As Plaintiffs have recognized, the Board of Education's four alleged failures to enact legally required policies involve "four distinct statutory requirements." Response Br. at 27. That means they are really pursuing four different "claims" and that they must have standing to pursue injunctive relief with respect to each of the four claims. *See Davis*, 554 U.S. at 734 (requiring independent standing to seek injunctive relief pertaining to two separate statutory requirements). And to establish standing for each claim, Plaintiffs must show that they face a *substantial* risk of harm from each policy failure.

The named plaintiffs have indicated that a lack of "guidance on how to implement [behavioral] supports" has already led to issues with implementing their individual behavioral supports and to the denial of their individual rights to a free appropriate public education.[12] *G.T.*, 2021 WL 3744607, at *7–8. That past experience of harm, combined

---

[12] When reviewing a motion for class certification, we typically "analyze standing based on the allegations of personal injury made by the named plaintiff. Without a sufficient allegation of harm to the named plaintiff in particular, he cannot meet his burden

with the ongoing risk that the harm will be repeated, is certainly sufficient to support standing to pursue injunctive relief with respect to the Board of Education's alleged failure to enact a policy about how to implement behavioral supports. *See Hutton*, 892 F.3d at 622.

But the past harm from a failure to implement behavioral supports does not speak as directly to whether the risk from, say, the Board of Education's failure to enact a policy on how to identify students who need behavioral supports is "substantial." That is not to say that the risk the named plaintiffs face is not substantial. Certainly, the risk of harm here seems less attenuated than the risk of harm we addressed in *Beck*.

But the district court did not make specific findings about whether the named plaintiffs' risk of harm was sufficiently substantial as to grant them standing as to each claim for injunctive relief. "[B]ecause we are a 'court of review, not first view,'" *United States v. Frank*, 8 F.4th 320, 333 (4th Cir. 2021) (quoting *Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 243 (4th Cir. 2020)), I therefore would vacate and remand for the district court to address that issue in the first instance.

---

of establishing standing." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (cleaned up). So, I focus here on the named plaintiffs' standing.

Because I would vacate the district court's decision, I do not address "the distinct question whether every class member must demonstrate standing before a court certifies a class." *TransUnion*, 594 U.S. at 431 n.4 (emphasis omitted) (declining to address this issue); *see also In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 141 (D. Md. 2022) (summarizing cases from other courts about when class-member standing must be established), *vacated on other grounds and remanded sub nom. In re Marriott Int'l, Inc.*, 78 F.4th 677 (4th Cir. 2023), and *reinstated by In re Marriott Int'l Customer Data Sec. Breach Litig.*, 345 F.R.D. 137 (D. Md. 2023).

IV.

The IDEA permits suits based on a risk-of-harm theory. Applying a risk-of-harm theory, Plaintiffs' claims for injunctive relief target the Board of Education's alleged failure to enact legally required policies, which pose a risk to all students with disabilities and particularly to those students who have already experienced disciplinary removals. That means all class members share a common risk of harm that would be addressed by an injunction pertaining to any of the Board of Education's relevant policy failures, even if some class members would benefit more from an injunction than would others.

Because the majority opinion takes too narrow a view of what lawsuits the IDEA permits and what Plaintiffs allege, I must respectfully dissent.[13] But because the district court must still analyze whether the risk of harm Plaintiffs face is sufficient to grant standing, I would nonetheless vacate the district court's class certification order and remand for further proceedings.

---

[13] In addition to the other critiques of the majority opinion raised herein, I note that the majority opinion's decision to reverse rather than vacate seems incongruous with its instructions for the district court to consider whether subclasses could satisfy Rule 23. *See* Maj. Op. at 26 & n.12. *But see DL*, 713 F.3d at 129 (opting, in a similar case on which the majority opinion relies, to "vacate the order certifying the class" and "remand the case to the district court for reconsideration of whether a class, classes, or subclasses may be certified"). It appears that, in effect, we all agree that the district court's original class-certification order was flawed and that it may reconsider class certification on remand.